PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1140
_____

ANTONIO PEARSON,
 Appellant

v.

PRISON HEALTH SERVICE; SOMERSET COUNTY
HOSPITAL; MEDICAL DIRECTOR R. MCGRATH; CHCA
M. VISINAKY; CHCA OVERTON; SYLVIA GIBSON;
GERALD L. ROZUM; CAPT. PAPUGA; LT. DOYKA;
SGT. RITTENOUR; ROBERT SOLARCZYK; JOHN DOE-
1; TAMMY MOWRY; SUSAN BARNHART; DR. PAUL
NOEL; KAREN OHLER; DR. SAMUEL WATTERMAN;
MELINDA SULLIVAN; D. TELEGA; DON KLOSS; CRAG
HOFFMAN; KUMUDA PRADHAN; D. RHODES;
THOMAS MAGYAR; DENISE THOMAS; D. BEDFORD;
COI FOUST; LINDA KLINE; RAYMOND J. SOBINA;
COI HEATH
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 3-09-cv-00097)
District Judge:  Honorable Kim R. Gibson
_____

Argued December 7, 2016
Before: FISHER*, KRAUSE and GREENBERG, *Circuit Judges.*

(Filed: March 7, 2017)

Robert J. Ridge
Brandon J. Verdream    **[ARGUED]**
Clark Hill
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh, PA 15219
        *Counsel for Appellant*

Kemal A. Mericli    **[ARGUED]**
Office of Attorney General of Pennsylvania
564 Forbes Avenue
6th Floor, Manor Complex
Pittsburgh, PA 15219
        *Counsel for Department of Corrections Appellees*

Kathryn M. Kenyon   **[ARGUED]**
Meyer Unkovic & Scott
535 Smithfield Street
1300 Oliver Building
Pittsburgh, PA 15222
        *Counsel for Appellee Medical Director McGrath*

_____

* Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Antonio Pearson is a prisoner who suffered from two serious medical needs during his incarceration at Pennsylvania State Correctional Institution–Somerset ("SCI-Somerset"). In 2009, he filed suit under 42 U.S.C. § 1983, claiming that various prison officials and an independent medical contractor were deliberately indifferent to those needs in violation of the Eighth Amendment. In this appeal, Pearson challenges the District Court's order granting summary judgment in favor of the five defendants remaining in this case. For the reasons set forth below, we will reverse the District Court's order, in part, insofar as it grants summary judgment in favor of Nurse David Rhodes. We will, however, affirm the District Court's order in all other respects.

**I**

**A**

In April 2007, medical officials at SCI-Somerset sent Pearson to the hospital twice within the same week to undergo surgery. The first was a surgery to remove his appendix. The second was a surgery to repair a urethral tear caused by the insertion of a catheter during the first surgery. The defendants are five individuals who were either aware of or responded to Pearson's requests for medical treatment before those surgeries. Dr. McGrath is a medical contractor who examined Pearson when he complained of bleeding after his first surgery. The other four defendants are Department of

3

Corrections employees, including three nurses who examined Pearson, and a guard who was informed of Pearson's bleeding on the morning of his second surgery.

### *Events Leading to Surgery for Appendicitis*

On April 10, 2007, Pearson began experiencing sharp pains in his abdomen and requested an appointment with the medical unit. At 1:00 p.m., Nurse Denise Thomas examined Pearson and noted that his pain intensified with certain movements and never fully relieved. Diagnosing him with a pulled muscle, she placed him on sick call for the following day without ordering additional treatment.

Pearson's excruciating pain continued and he returned to medical at 5:00 p.m. This time, Nurse Linda Kline examined him, offered Tylenol or Maalox, and instructed him to rest until his sick-call appointment in the morning. According to Pearson, she told him that his gallbladder was failing.

At approximately 11:00 p.m. that night, Pearson told the block officer that he was in severe pain and asked him to call the medical unit. After speaking with the medical unit, the officer returned to Pearson's cell and told him that Nurse David Rhodes would not come to see him because two nurses had already examined him, and he was on sick-call for the following day. Left in excruciating pain, Pearson screamed for several hours until the officer called medical again. This time, Nurse Rhodes came to his cell with a wheelchair—but Nurse Rhodes was upset, Pearson alleges, and told him that he would not be taken to medical unless he placed himself in the wheelchair. Unable to walk and in pain, Pearson claims that he was forced to crawl across the floor to the wheelchair.

Nurse Rhodes took Pearson to the infirmary and examined him. He checked his vitals and recognized that Pearson had possible signs of appendicitis. Because

4

abdominal pain has many causes and Pearson was scheduled for a doctor's examination in the morning, Nurse Rhodes thought a period of watchful waiting would be prudent and placed Pearson inside an infirmary cell for observation. At this time, Nurse Rhodes put an order on Pearson's chart for "nothing by mouth" as a precaution in case he needed surgery but did not elevate Pearson's condition to another medical official. J.A. 124, 288-91. Continuing to suffer in pain, Pearson screamed throughout the night.

At approximately 10:00 a.m. on April 11, Pearson was seen by Dr. Ghatge, who ordered him sent to Somerset Hospital for evaluation. Later that day, Pearson was diagnosed with appendicitis and a surgeon removed Pearson's inflamed appendix, as well as a gangrenous part of his omentum.

### Events Prior to Surgery for Urethral Tear

On April 14, 2007, Pearson returned to the prison with an order from his attending surgeon that he be scheduled for a follow-up examination in one week. He was examined by a prison nurse and prescribed Motrin, physical therapy, and a follow-up with a physician's assistant before being sent back to his cell. J.A. 115, 132, 377.

On April 15, Pearson began experiencing sharp pains and felt liquid running down his leg, which he later identified as blood flowing from his penis. He requested to be seen by medical. According to Pearson, the correctional officer called medical, but Nurse Kline instructed the officer that bleeding was normal after surgery and that Pearson should just lie down on his bunk. She did not examine him.

At this point, Pearson claims that he continued to bleed in constant pain until the block officer witnessed it and sent him directly to the medical unit. At medical, Pearson maintains, Nurse Magyar had him undress in case he needed

5

to go to the hospital and called Dr. McGrath, who was angry at being called at home. During that call, Dr. McGrath ordered antibiotics as well as an increased intake of fluids. J.A. 115-16, 377. He also instructed the nurse to place Pearson in the infirmary for over-night observation.

Dr. McGrath examined Pearson at 6:45 a.m. the following morning, diagnosed the bleeding as a normal consequence of the recent surgery, and sent him back to his cell. During the examination, Dr. McGrath collected lab work, ordered antibiotics, and scheduled a follow-up appointment. J.A. 116-17, 377-78. Later that night, Pearson began bleeding again and collected a quarter of a cup of blood in a glove to show the extent of it. He then complained about the bleeding to Sergeant Rittenour. According to Pearson, Rittenour relayed his complaint to Captain Thomas Papuga, who ordered Rittenour to discard the blood Pearson collected in the glove. But Papuga knew that Pearson was receiving medical care—one of the cell block officers contacted medical and relayed to Captain Papuga that Pearson was unsatisfied with their response. J.A. 324, 385.

At 7:00 a.m. on April 17, Pearson began bleeding again. He returned to medical where Dr. McGrath observed the bleeding and transferred him to the emergency department at Somerset Hospital. At the hospital, it was determined that Pearson was suffering from a urethral tear caused during his prior surgery. Pearson underwent a second surgery to cauterize the tear and was returned to SCI-Somerset the same day.

**B**

In 2009, Pearson filed suit, *pro se*, under 42 U.S.C. § 1983, alleging that twenty-eight defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Shortly thereafter, the District Court

6

dismissed Pearson's complaint for failure to state a claim, and, on October 16, 2009, we vacated that dismissal, holding that several of Pearson's allegations stated a claim for deliberate indifference, including his allegations against Nurse Thomas, Nurse Kline, Nurse Rhodes, and Dr. McGrath. *Pearson v. Prison Health Serv*., 348 F. App'x 722, 725-26 (3d Cir. 2009). At the time, we left open whether the other defendants might be able to raise grounds for dismissal under Federal Rule of Civil Procedure 12(b)(6). *Id*. at 725. And we ordered the District Court to allow Pearson to amend his complaint before dismissing it. *Id*. at 726.

On remand, Pearson filed an amended complaint, and in 2011, the District Court dismissed the claims against all the defendants except Nurse Kline, Nurse Rhodes, Captain Papuga, and Dr. McGrath for failure to state a claim. Nine months later, the District Court entered summary judgment in favor of Dr. McGrath and dismissed Pearson's actions against Nurse Kline, Nurse Rhodes, and Captain Papuga as a sanction for failure to prosecute. Pearson appealed and this Court vacated the dismissal against Nurse Thomas, Nurse Kline, Nurse Rhodes, and Captain Papuga as well as the summary judgment order in favor of Dr. McGrath. *Pearson v. Prison Health Serv.,* 519 F. App'x 79, 82-84 (3d Cir. 2013). Once again, we remanded this case to the District Court.

During the second remand, counsel was appointed for Pearson,[1] who requested funds for the retention of a qualified medical expert to develop malpractice and informed-consent claims against Somerset Hospital and his appendicitis surgeon, Dr. Pradham. Those requests were denied, and, in

---

[1] Counsel for Pearson is appearing *pro bono*. We express our gratitude to counsel for accepting this matter and for the quality of his representation.

7

2015, the Magistrate Judge issued a report and recommendation advising that summary judgment be entered for the five remaining defendants in this case. The District Court adopted the report and recommendation and granted summary judgment in favor of the appellees. This timely appeal followed.

## II

The District Court had jurisdiction over this case under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's order granting summary judgment, applying the same standard as the district court. *Interstate Outdoor Advert., L.P. v. Zoning Bd. of Twp. of Mt. Laurel*, 706 F.3d 527, 529-30 (3d Cir. 2013). To prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To assess whether the moving party has satisfied this standard, we do not engage in credibility determinations, *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998), and we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).

## III

The Eighth Amendment, through its prohibition on cruel and unusual punishment, prohibits the imposition of "unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling v. McKinney*,

8

509 U.S. 25, 32 (1993). Accordingly, in *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that prison officials violate the Eighth Amendment when they act deliberately indifferent to a prisoner's serious medical needs by "intentionally denying or delaying access to medical care or interfering with the treatment once prescribed." *Id.* at 104-05. In order to sustain this constitutional claim under 42 U.S.C. § 1983,[2] a plaintiff must make (1) a subjective showing that "the defendants were deliberately indifferent to [his or her] medical needs" and (2) an objective showing that "those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).

In this case, the parties agree that Pearson's appendicitis and urethral tear both constitute serious medical needs, and, as we noted the first time this case was appealed, we think it beyond question that both medical issues were serious. *See Pearson*, 348 F. App'x at 724; *see also Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003) ("[T]his Court has defined a medical need as serious if it has been diagnosed by a physician as requiring treatment"); *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000) (affirming that "an appendix on the verge of rupturing" is a serious medical need). Thus, the only question on appeal is whether Pearson

---

[2] While Pearson brings this case under 42 U.S.C. § 1983, the substantive right at issue nonetheless derives from the Eighth Amendment. As the Supreme Court has remarked, Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution . . . that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

9

has presented sufficient evidence from which a reasonable jury could find that the defendants were deliberately indifferent.

In its decision below, the District Court granted summary judgment on all of Pearson's Eighth Amendment claims. It found that expert testimony was "necessary" for a reasonable jury to find that the defendants acted with deliberate indifference because Pearson's "entire claim rests on the assertions that his care was inadequate." J.A. 11. On appeal, Pearson argues that the record is sufficient without expert testimony to create a genuine issue of material fact as to whether Nurse Thomas, Nurse Rhodes, Nurse Kline, Captain Papuga, and Dr. McGrath were deliberately indifferent. For the reasons stated below, we disagree with the District Court's conclusion that expert testimony was necessary in this case. And, because the record is sufficient for a reasonable jury to find that Nurse Rhodes acted with deliberate indifference to Pearson's serious medical needs, we will reverse the District Court's order, in part, insofar as it grants summary judgment in favor of Nurse Rhodes.

**A**

To assess whether summary judgment was appropriate, we must first consider whether the District Court properly held that expert testimony was necessary in this case. If that legal conclusion is correct, we can affirm the District Court's decision without further analysis. If not, we must also consider whether Pearson has offered sufficient evidence for a reasonable jury to find in his favor.

At the outset, we note that in our most recent opinion in this case, we observed that it is "not clear that an expert opinion is necessary." *Pearson*, 519 F. App'x at 82. We also note that our prior consideration of when expert testimony is required in a deliberate indifference case has only addressed

10

when expert testimony is necessary to create a genuine dispute that the prisoner's medical needs are serious. In *Boring v. Kozakiewicz*, 833 F.2d 468 (3d Cir. 1987), we held that a district court may properly require expert medical opinions when, "[a]s laymen, the jury would not be in a position to decide whether any of the conditions described by plaintiffs could be classified as 'serious.'" *Id.* at 473. In *Brighthwell v. Lehman*, 637 F.3d 187 (3d Cir. 2011), we reiterated our holding in *Boring*, clarifying that expert testimony "is not necessarily required to establish the existence of a serious medical need" and that "[o]ther forms of extrinsic proof . . . may suffice in some cases." *Id.* at 194 n.8.

Because the parties agree that Pearson's medical need was serious, this appeal requires us to resolve an issue of first impression in this Circuit. We must decide for the first time whether and when medical expert testimony may be necessary to create a triable issue on the subjective prong of a deliberate indifference case. In answering this question, three principles guide our analysis. The first is that deliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony. *See, e.g.*, *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (noting that, when "intent becomes critical," it is "important that the trier of fact hear" the defendant's "testimony in order to assess his credibility"); *Campbell v. Sikes*, 169 F.3d 1353, 1372 (11th Cir. 1999) ("[P]laintiffs necessarily must use circumstantial evidence to establish subjective mental intent."); *In re Kauffman,* 675 F.2d 127, 128 (7th Cir. 1981) ("Intent . . . must be gleaned from inferences drawn from a course of conduct." (internal quotation marks omitted)).

11

The second principle is that there is a critical distinction "between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment." *United States ex. rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979). Because "mere disagreement as to the proper medical treatment" does not "support a claim of an eighth amendment violation," *Monmouth Cty. Corr. Inst. v. Lanzaro*, 834 F.2d 326, 346 (3d. Cir. 1987), when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care. *See Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights").

The third and final principle is that the mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care. *Durmer*, 991 F.2d at 69 n.13 (noting a plaintiff can only proceed to trial when there is a genuine issue of fact regarding both the adequacy of medical care and the defendant's intent). This observation is critical because it makes clear that there are two very distinct subcomponents to the deliberate indifference prong of an adequacy of care claim. The first is the adequacy of the medical care—an objective inquiry where expert testimony could be helpful to the jury. The second is the individual defendant's state of mind—a subjective inquiry that can be proven circumstantially without expert testimony.

Based upon these observations, we think that medical expert testimony may be necessary to establish deliberate indifference in an adequacy of care claim where, as laymen, the jury would not be in a position to determine that the

12

particular treatment or diagnosis fell below a professional standard of care. As is the case with evaluating whether the prisoner is suffering from a serious medical need, evaluating whether medical treatment is adequate presents an objective question typically beyond the competence of a non-medical professional. Likewise, it makes sense to require a prisoner to offer extrinsic proof regarding the quality of medical care in adequacy of care cases when, to defeat our presumption that the medical care provided to him or her was adequate, the prisoner must show that the medical official did not exercise professional judgment. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (holding that when the burden of persuasion at trial would be on the nonmoving party, "the party moving for summary judgment may satisfy Rule 56" by demonstrating that "the nonmoving party's evidence is insufficient to establish an essential element of [its] claim"); *Durmer*, 991 F.2d at 67 ("[P]rison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners."); *Brown*, 903 F.2d at 278 ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").

Nonetheless, for two reasons, we disagree with the District Court's conclusion that medical expert testimony was necessary in this case. First, we believe that conclusion ignores our decision in *Brightwell*, where we noted that expert testimony "is not necessarily required" where other forms of extrinsic proof may suffice. 637 F.3d at 194 n.8. In this case, Pearson has not offered any extrinsic proof regarding the quality of his medical care, and, it may well be possible that other forms of extrinsic proof (e.g., a training manual, photograph, or medical records) could have permitted a reasonable jury to find that his medical care was inadequate. Accordingly, to the extent we agree with the

13

District Court that a reasonable jury could not find in Pearson's favor on this record, we believe that it is additional extrinsic proof, rather than an expert witness specifically, that was required for him to survive summary judgment.

Second, we disagree with the District Court's conclusion that additional proof was needed to create a triable issue on all, rather than just some, of Pearson's deliberate indifference claims. Certainly, for the reasons just stated, extrinsic evidence is needed to create a triable issue on Pearson's adequacy of treatment claims where it would not be obvious to a layperson that the defendant breached a professional standard of care. However, Pearson also raises two claims that he was delayed or denied treatment outright for a non-medical reason and one adequacy of treatment claim where it would be apparent to a layperson that his medical treatment violated a professional standard of care. For these claims, additional extrinsic proof was not necessary to survive summary judgment, and we hold that the District Court erred in concluding otherwise.

For Pearson's claim that Nurse Rhodes forced him to crawl to a wheelchair, we believe that Pearson's sworn testimony is sufficient to create a genuine issue of fact that Nurse Rhodes acted with deliberate disregard to his medical needs. *See Bushman v. Halm*, 798 F.2d 651, 661 (3d Cir. 1986) (noting that in "the absence of any contrary medical evidence, plaintiff's sworn testimony must be taken as true for purposes of creating a fact issue."). As noted above, our precedent provides that a plaintiff can proceed to trial on an adequacy of care claim when there is a genuine issue of fact regarding both the adequacy of care and the defendant's intent. *Durmer*, 991 F.2d at 69 n.13. And we do not think additional extrinsic proof is necessary for Pearson to create a genuine dispute of fact on either issue for this claim. A

14

layperson is capable of concluding that forcing a screaming patient to crawl to a wheelchair violates professional standards of care.[3] And a reasonable jury could find that Nurse Rhodes knew Pearson could not walk and deliberately failed to assist him for non-medical reasons.

For Pearson's claims that he was delayed or denied medical treatment for a non-medical reason, we also believe that requiring additional extrinsic proof would be inappropriate given the subjective nature of scienter and our case law on deliberate indifference. Again, a delay or denial of medical treatment claim must be approached differently than an adequacy of care claim. *Fayette Cty.*, 599 F.2d at 575 n.2. Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry—since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim.

---

[3] Indeed, expert testimony is not admissible, let alone required to create a genuine issue of fact as to whether the care the prisoner received was adequate, if it was obvious to the jury that the care violated professional standards. *See, e.g.*, *Calhoun v. Yamaha Motor Corp. U.S.A.*, 350 F.3d 316, 320-21 (3d Cir. 2003) (noting that Rule 702 requires expert testimony to "assist the trier of fact" (internal quotation marks omitted)); Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules (noting that expert testimony is not helpful "when the untrained layman would be qualified to determine . . . the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute").

Absent that objective inquiry, extrinsic proof is not necessary for the jury to find deliberate indifference in a delay or denial of medical treatment claim. All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors. *See, e.g.*, *Durmer*, 991 F.2d at 68-69; *United States v. Michener*, 152 F.2d 880, 885 (3d Cir. 1945) ("[I]t is for the jury to determine the weight to be given to each piece of evidence . . . particularly where the question at issue is the credibility of the witness."). The District Court erred in holding otherwise.

In sum, because it is just as difficult for a layperson to assess the adequacy of medical care as it is for them to assess the seriousness of a medical condition, we hold that medical expert testimony may be necessary in some adequacy of care cases when the propriety of a particular diagnosis or course of treatment would not be apparent to a layperson. Nonetheless, we disagree with the District Court's conclusion that expert testimony was necessary in this case because we are not satisfied that medical expert testimony would be necessary for all of Pearson's claims, nor are we satisfied that other forms of extrinsic proof would not have sufficed.

**B**

Because the District Court incorrectly held that expert testimony was necessary for Pearson to survive summary judgment, we must now consider whether the record in this case was sufficient to create a genuine issue of material fact as to whether Nurse Thomas, Nurse Rhodes, Nurse Kline, Captain Papuga, and Dr. McGrath were deliberately indifferent to Pearson's serious medical needs. As the Supreme Court has explained, "deliberate indifference entails something more than mere negligence" and is a subjective standard that requires the official to both "be aware of facts

16

from which the inference could be drawn that a substantial risk of serious harm exists" and to "also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994). In prior cases, we have found deliberate indifference in a variety of contexts including where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs. *Lanzaro*, 834 F.2d at 347. Because each defendant played a different role in regard to Pearson's treatment at SCI Somerset, we will address Pearson's claims against each of them in turn.

### 1. Claims Against Nurse Thomas

Pearson first claims that the District Court erred when granting summary judgment to Nurse Thomas. He argues that a reasonably jury could find that she acted with deliberate indifference because she did not raise his abdominal pain with other staff and offered no medical assistance other than to place him on sick call.

We disagree. First, even if a reasonable jury could find that Nurse Thomas was negligent in diagnosing or treating his pain, that would not be enough for the jury to find that Nurse Thomas acted with deliberate indifference in violation of the Eighth Amendment. As the Supreme Court has held, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106; *see also Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) ("Allegations of medical malpractice are not sufficient to establish a Constitutional violation.").

17

Second, while Pearson claims that Nurse Thomas delayed or denied him medical care, it is undisputed that she examined him, diagnosed him with a pulled muscle, and decided not to elevate his condition based on her opinion that it was not severe. Thus, his claim against her is one that she inadequately diagnosed and treated his medical condition. As we remarked earlier, that distinction is critical—because the deliberate indifference standard "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients," we must "disavow any attempt to second-guess the propriety or adequacy of [their] particular course of treatment" so long as it "remains a question of sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation marks omitted); *see also Brown*, 903 F.2d at 278 ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); *Fayette Cty.,* 599 F.2d at 575 n.2 ("[F]ederal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." (internal quotation marks omitted)).

Here, Pearson has offered no circumstantial evidence suggesting that Nurse Thomas subjectively appreciated the true seriousness of the risk of harm. Nor did he produce extrinsic evidence suggesting that Nurse Thomas's treatment decision regarding the symptoms of which she had awareness was "a substantial departure from accepted professional judgment, practice, or standards" such that a reasonable jury could conclude that she "actually did not base [her] decision on such judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). Accordingly, no reasonable jury could find that she acted with the "obduracy and wantonness" that violates the

18

Eighth Amendment, and we agree with the District Court that Nurse Thomas is entitled to summary judgment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . .").

## *2. Claims Against Nurse Kline*

For similar reasons, we also agree with the District Court that Nurse Kline is entitled to summary judgment. Although Pearson argues that a reasonable jury could find that she was deliberately indifferent to his appendicitis when she told him that his gallbladder was failing but merely offered him Tylenol and Maalox, we disagree. Without extrinsic evidence showing that a failing gall bladder is emergent or necessitates some other response, no layperson would be able to find that Nurse Kline's determination that Pearson should rest until his examination in the morning was "a substantial departure from accepted professional judgment, practice, or standards." *Youngberg*, 457 U.S. at 323. Hence no reasonable jury could find that this response violated the Eighth Amendment. *See, e.g.*, *Brown*, 903 F.2d at 278 ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").

Likewise, while Pearson maintains that a reasonable jury could find that Nurse Kline acted with deliberate indifference to his urethral tear when she initially declined to examine his bleeding on April 15 and then noted a "copious" amount of blood, J.A. 126, in his underwear without escalating his situation, we believe that the record fails to create a triable issue as to whether Nurse Kline acted with deliberate indifference. Whether or not Nurse Kline escalated Pearson's condition, it is clear that his condition was elevated

19

to Dr. McGrath once Pearson was taken to the infirmary. Nurse Kline cannot be held liable for allowing a different nurse to escalate Pearson's condition, nor can she be held liable for following Dr. McGrath's orders that Pearson remain in the infirmary overnight. *See Durmer*, 991 F.2d at 69 (noting non-physicians cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor").

Finally, even if Nurse Kline refused to examine Pearson when the correctional officer first called about his bleeding, the circumstances surrounding this refusal are not sufficient to create a triable issue as to whether she violated the Eighth Amendment. While Pearson points to evidence that Nurse Kline delayed her examination because she believed that his bleeding was normal after surgery, this serves only to reinforce that she failed to immediately appreciate the severity of his medical needs. Absent evidence that the seriousness of his bleeding was communicated to her at that time, a reasonable jury could not conclude she was "aware of facts from which the inference could be drawn that a substantial risk of serious harm existe[d]" and that she "also dr[ew] the inference. *See Farmer*, 511 U.S. at 837. And that is only particularly so here—given this lack of communication regarding the seriousness of the bleeding, and given that Pearson was under the care of Dr. McGrath, who had prescribed medicine and physical therapy upon Pearson's return from his appendectomy, Nurse Kline was justified in believing that Pearson was not in danger absent instructions

from Dr. McGrath or Pearson's surgeon that bleeding should be treated as more than a normal consequence of his surgery.[4]

### 3. Claims Against Nurse Rhodes

Pearson next argues that a reasonable jury could find that Nurse Rhodes acted with deliberate indifference to his medical needs because Nurse Rhodes (1) refused to examine him in his cell when the block officer first called medical, (2) forced him to crawl to the wheelchair to obtain medical treatment, and (3) did nothing but order him placed in the infirmary overnight despite recognizing signs of appendicitis. We agree with Pearson that these claims create a triable issue as to whether Nurse Rhodes acted with deliberate indifference to his needs. We will therefore reverse the order of the District Court, in part, insofar as it grants summary judgment in favor of Nurse Rhodes.

---

[4] In *Spruill*, we specifically indicated that a non-medical prison official will not be chargeable with deliberate indifference, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." 372 F.3d at 236. Now confronted with a set of defendants who are not physicians but have some amount of medical training, we clarify that the same division of labor concerns that underlie that rule apply when a nurse knows that a prisoner is under a physician's care and has no reason to believe that the doctor is mistreating the prisoner. Given that it is the physician with the ultimate authority to diagnose and prescribe treatment for the prisoner, a nurse who knows that the prisoner is under a physician's care is certainly "justified in believing that the prisoner is in capable hands," *id*., so long as the nurse has no discernable basis to question the physician's medical judgment.

Pearson's claim that Nurse Rhodes failed to examine him when he initially requested medical assistance creates a triable issue as to whether Nurse Rhodes was deliberately indifferent because it raises a claim that Pearson was either denied reasonable requests for medical treatment, or necessary medical treatment was delayed for non-medical reasons. Unlike Nurse Kline, Nurse Rhodes cannot claim that Pearson was already being treated by a physician. In addition, when Rhodes initially denied medical care, he was confronted with a report from a corrections officer that an inmate was suffering from excruciating pain—an inmate who had twice sought medical assistance earlier in the day, reporting the same complaint but with increasing severity. As *Farmer* noted, an official may not escape liability by "merely refus[ing] to verify underlying facts that he strongly suspect[s] to be true, or declin[ing] to confirm strong inferences of risk that he strongly suspect[s] to exist." *Farmer*, 511 U.S. at 843 n.8. Neither is he immunized from liability merely because he delays care for an emergent condition in reliance on a sick call policy. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003). Because these circumstances may suggest that Nurse Rhodes engaged in a pattern of deliberately indifferent conduct in spite of evidence that he was aware that Pearson faced a substantial risk of harm, there is a genuine issue of fact as to why Nurse Rhodes refused to examine Pearson and "we cannot conclude as a matter of law [his] conduct did not run afoul of the [Eighth Amendment]." *Durmer*, 991 F.2d at 68.

Likewise, Pearson's claim that he was forced to crawl to the wheelchair creates a genuine dispute as to whether Nurse Rhodes acted with deliberate indifference. Viewing the record in Pearson's favor, as we must, Nurse Rhodes forced a

patient, who had been screaming in pain for several hours, to crawl to a wheelchair despite indicating that he was unable to walk. We do not believe that additional evidence is required for a reasonable jury to conclude that this conduct violates a professional standard of care or that such conduct entails the obduracy and wantonness that is proscribed by the Eighth Amendment. *See, e.g.*, *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980) (reversing grant of summary judgment where the plaintiff claimed that defendants refused to give him a wheelchair, forcing him to crawl on the floor). [5]

Finally, Pearson's claim that Nurse Rhodes merely ordered observation despite recognizing signs of appendicitis creates a triable issue as to whether Nurse Rhodes acted with deliberate indifference. On its own, this claim might not be sufficient to survive summary judgment—because Nurse Rhodes examined and diagnosed Pearson in the infirmary, we would be confronted with an adequacy of treatment claim that lacks extrinsic evidence showing that Nurse Rhodes' response "so deviated from professional standards of care that it

_____

[5] Rhodes correctly points out that Pearson's only evidence of this event is his own testimony. However, counsel for Rhodes conceded at argument that we would be compelled to reverse and remand this issue for trial if it did, in fact, occur as Pearson describes. *See* Oral Argument at 42:38–44:47. We, of course, must credit Pearson's testimony. While we require more than conclusory affidavits to create a genuine issue of material fact, *MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 485 n.6 (3d Cir. 2013), when deciding a motion for summary judgment, "the evidence of the non-movant is to be believed," and credibility determinations must be left to the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

amounted to deliberate indifference." *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) (internal quotation marks omitted). But that examination did not occur until after Nurse Rhodes refused to treat Pearson and allegedly forced him crawl to a wheelchair. This pattern of disinterested conduct "separates this complaint from ordinary allegations of medical malpractice." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990). Indeed, while "one reasonable reading of the record in this case" is that Nurse Rhodes ordered observation in the infirmary based on his informed medical judgment, "we cannot conclude that it is the only one" because, insofar as the record suggests that Nurse Rhodes repeatedly ignored Pearson's requests for treatment based on non-medical reasons, a reasonable jury could find that Nurse Rhodes also had a non-medical motive for leaving Pearson in the infirmary overnight. *Durmer*, 991 F.2d at 67. Accordingly, because Nurse Rhodes suspected appendicitis, a condition that would have put him on notice that a "substantial risk of serious harm exists," we cannot conclude as a matter of law that this observation order did not violate the Eighth Amendment. *Farmer*, 511 U.S. at 837.[6]

_____

[6] Nurse Rhodes argued that he was entitled to qualified immunity because it was not clearly established at the time of these events that an official would be liable for a delay in care without expert medical evidence that the inmate suffered harm as a result. This fundamentally misunderstands the qualified immunity inquiry. Qualified immunity requires us to ask whether a reasonable official would have understood, at the time of the challenged conduct, that what he or she was doing violated an established right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).That analysis cannot turn on facts that could not be known to an official at the time, like whether the

*4. Claims Against Dr. McGrath*

Next, Pearson maintains that Dr. McGrath demonstrated a pattern of deliberate indifference to his medical needs through three incidents after he returned to the prison following his appendix surgery. The first is that Dr. McGrath ordered Pearson sent directly back to the general population without any observation period in the prison infirmary, and without ordering the follow-up prescribed by Pearson's surgeon. The second is that Dr. McGrath was angry and simply ordered Pearson to be placed in the infirmary overnight when Nurse Magyar called him about Pearson's bleeding on April 15. The third is that Dr. McGrath told Pearson his bleeding was normal and discharged him back to his cell after an examination on April 16.

We agree with the District Court that Dr. McGrath is entitled to summary judgment. Whether or not Dr. McGrath was angry at being called at home on April 15, Pearson does not dispute that Dr. McGrath prescribed treatment over the phone, ordering observation in the infirmary, antibiotics, and

---

plaintiff would ultimately be able to produce expert testimony that the delay resulted in harm. It was sufficiently clear at the time of these events that exposing an inmate to the kind of severe and protracted pain and mental anxiety alleged in this case could expose an official to Eighth Amendment liability. *See Lanzaro*, 834 F.2d at 346; *White*, 897 F.2d at 111.

25

increased intake of fluids. J.A. 115-16, 377.[7] Pearson also concedes that he was not in immediate danger at the time, and that Dr. McGrath examined him at 6:45 a.m. the following morning, diagnosing his bleeding as a normal consequence of the surgery in addition to collecting lab work and scheduling a follow-up appointment. J.A. 116-17, 377-78. Because medical treatment was provided on both occasions and Pearson has provided no extrinsic evidence that would permit a layperson to conclude that Dr. McGrath's actions constituted "a substantial departure from accepted professional judgment, practice, or standards," a reasonable jury could not find that he was deliberately indifferent either occasion. *Youngberg*, 457 U.S. at 323; *see also Pierce*, 612 F.2d at 754 ("Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment" so long as it "remains a question of sound professional judgment." (internal quotation marks omitted)).

Taking those claims away, the sole assertion that Pearson has against Dr. McGrath is that McGrath was deliberately indifferent for sending him back to the general prison population without any observation period in the prison infirmary and without ordering the lifting restrictions or follow-up appointment prescribed by Pearson's surgeon. As with Pearson's other claims against Dr. McGrath, the record is not sufficient for a reasonable jury to conclude that

---

[7] Pearson points to this call as circumstantial evidence of Dr. McGrath's state of mind that reflects, in combination with evidence of the totality of his interactions with Dr. McGrath, deliberate indifference. While such circumstantial evidence may be relevant to the subjective inquiry, the evidence here is still not sufficient for a reasonable jury to conclude that he had a sufficiently culpable state of mind.

Dr. McGrath was deliberately indifferent to his medical needs. Since Dr. McGrath ordered pain medication, exercise to help with breathing, and a follow-up medical appointment upon Pearson's return to the prison, any complaint that he should have ordered additional observation is no more than a "mere disagreement as to the proper medical treatment" that does not "support a claim of an eighth amendment violation." *Lanzaro*, 834 F.2d at 346; *see* J.A. 132. At the same time, while prison authorities may be held liable under the Eighth Amendment when they "prevent an inmate from receiving recommended treatment for serious medical needs," we cannot find that this is such a case. *Pierce*, 612 F.2d at 762. Unlike in our prior interference-with-prescribed treatment cases, there is nothing in the record indicating that Dr. McGrath refused to allow Pearson to receive the prescribed treatment, let alone that Dr. McGrath knew that the lifting restriction or the follow-up appointment had been prescribed.[8] Absent such evidence, this claim is merely that Dr. McGrath negligently failed to order the prescribed treatment, and, because deliberate indifference "entails something more than mere negligence," no reasonable jury could find him liable for this conduct under the Eighth Amendment. *Farmer*, 511 U.S. at 835.

### 5. Claims Against Captain Papuga

Finally, we agree with the District Court that Captain Papuga is entitled to summary judgment. As our precedent makes clear, "a non-medical prison official" cannot "be charge[d] with the Eighth Amendment scienter requirement of deliberate indifference" when the "prisoner is under the

---

[8] In fact, as the follow-up appointment was scheduled to take place after the second surgery, it is not the case that the prison ever violated the surgeon's orders.

care of medical experts" and the official does not have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Spruill*, 372 F.3d at 236; *see also Durmer*, 991 F.2d at 69 (holding that non-physicians cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor"). Whether or not Captain Papuga ordered Sergeant Rittenour to discard Pearson's blood, Pearson was being treated by medical, and Captain Papuga was only made aware of Pearson's bleeding after the cell block officers contacted medical regarding his condition. J.A. 324, 385. Accordingly, since Pearson has identified no reason for Captain Papuga to believe that he was being mistreated, no reasonable jury could conclude that Captain Papuga was deliberately indifferent for failing to second-guess the medical staff's appraisal of the situation.

## IV

Regretfully, we must comment on one final issue that has percolated over the course of this litigation. During his prior appeal in 2013, Pearson argued that the Magistrate Judge and District Judge should recuse themselves because they were biased against him. At the time, we were satisfied that neither judge would harbor bias on remand, but we did express concern with their editorializing on prisoner litigation when dismissing Pearson's complaint. Specifically, the Magistrate Judge's report and recommendation "criticized inmate medical claims in general" and made general observations regarding frivolous litigation filed by prisoners that had "no apparent bearing on the merits of Pearson's claims." *Pearson*, 519 F. App'x at 84.[9]

---

[9] The precise language we admonished was:

28

When we remanded this case, we were hopeful that the Magistrate Judge and District Judge would cease making these kinds of irrelevant, categorical statements for several reasons, including that they are unnecessary and might cast our judicial system in a bad light by leading an observer to question the impartiality of these proceedings. In addition, it is antithetical to the fair administration of justice to pre-judge an entire class of litigants, and we expect courts to conduct, at a minimum, a careful assessment of the claims of each party. By failing to exhibit such an individualized inquiry, these statements disserved the important principle that "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 13 (1954).

Despite our optimism, and despite our admonishment of these sorts of categorical statements, this commentary

> Inmate complaints often result in the naming of as many defendants as the inmate can remember . . . even though there is no legal claim against them in the complaint, no viable legal claim within any likely amendment to the complaint, and no interest on the part of the inmate in following through. They generate large litigation expenses which divert resources even from the medical care provided to inmates not to mention other uses the Commonwealth of Pennsylvania and its taxpayers might have for the money. This case is a textbook example.

*Pearson*, 519 F. App'x at 84 (alteration in original) (quoting *Pearson v. Prison Health Service*, No. 09-97, 2011 WL 4473462, at *3 (W.D. Pa. Aug. 18, 2011)).

continued since we last remanded this case to the District Court. While Pearson has not renewed his motion for recusal either in the District Court or on appeal, we note that in one prior opinion, the District Court adopted a report and recommendation in which the Magistrate Judge stated: "To repeat what I have said before, what is even more perverse is that [appointing an expert in prisoner litigation] would be a benefit only available to the class of litigants that has uniquely demonstrated to Congress that it files an undue amount of frivolous and meritless lawsuits." *Pearson v. Prison Health Serv.,* No. 09-97, 2014 WL 2860660, at \*4 (W.D. Pa. June 23, 2014). Likewise, in the report and recommendation adopted by the District Court in granting summary judgment to the appellees, the Magistrate Judge made several statements regarding prisoners such as noting that "anyone reading the news is familiar with inmates using bodily fluids, especially blood, as weapons." J.A. 459.[10]

---

[10] "Although a magistrate is not an Article III judge, … a district court may refer dispositive motions to a magistrate for a recommendation so long as 'the entire process takes place under the district court's total control and jurisdiction,' and the judge 'exercise[s] the ultimate authority to issue an appropriate order.'" *Thomas v. Arn*, 474 U.S. 140, 153 (1985) (citation omitted); *see also* 28 U.S.C. § 636(b)(1). The District Court is thus ultimately responsible for the decision, including for the Magistrate's report and recommendation if it is adopted in its entirety, but magistrate judges play an important role in the operation of the federal courts and must take care to word their published recommendations accordingly. Indeed, it is equally applicable to District Judges and Magistrates that "[w]henever a judge's impartiality 'might reasonably be questioned' in a proceeding, 28 U.S.C.

As we noted in Pearson's prior appeal and will reiterate now, Pearson suffered from two serious medical conditions, and "it does not appear . . . that he filed this lawsuit for recreational purposes or to harass prison personnel." *Pearson*, 519 F. App'x at 84. It appears he filed this suit because he genuinely believes that the prison officials acted deliberately indifferent to his medical needs in violation of his constitutional rights. Whether or not he ultimately prevails, equality before the law is one of the founding principles of our government and Pearson deserves to have his case treated as carefully and thoughtfully as any other litigant's.

While we remain convinced that the Magistrate Judge and District Judge are capable of handling Pearson's trial without any bias, we trust that our message will be heard on this third remand and that this editorializing will cease going forward.

## V

For the reasons set forth above, we will affirm the judgment of the District Court as to Nurse Thomas, Nurse Kline, Captain Papuga, and Dr. McGrath, reverse as to Nurse Rhodes, and remand for further proceedings consistent with this opinion.

---

§ 455(a) commands the judge to disqualify himself *sua sponte* in that proceeding." *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 162 (3d Cir. 1993).