**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1246
_____

PARIS L. JAMES,
Appellant

v.

DAVID VARANO; KATHRYN MCCARTY;
RN LORI ALDERMAN; PA BRIAN DAVIS;
PA JENNIFER DAYA; RN JANE DOE #1;
RN MATT HYDE; LIEUTENANT MASSER;
SGT. KRZOWSKI; C/O/ BAKER; C/O SCHOOCH;
CO RODRIGUEZ; C/O BROUGHS;
CO NOVALIS; CO KRATZ; SGT. ELSEE;
THOMAS MOSIER; KEITH TRIPP;
C/O JOHN DOE #1; C/O JOHN DOE #2;
SERGEANT ROD ROMIG; CO SCOTT SEGEDY;
C/O JOHN DOE#5; C/O JOHN DOE #6;
C/O JOHN DOE #7; C/O JOHN DOE #8;
C/O JOHN DOE #9; CO PAUL GOODWIN;
C.O. JOHN DOE #12
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:14-cv-01951)
U.S. District Judge: Honorable Yvette Kane
_____

Argued
July 6, 2022
_____

Before: SHWARTZ, KRAUSE, and ROTH, <u>Circuit Judges</u>.

(Filed: January 17, 2023)

Grace Cho[1] [ARGUED]
University of Pennsylvania School of Law
3400 Chestnut Street
Philadelphia, PA 19104

Stuart T. Steinberg
Dechert
2929 Arch Street,
18th Floor, Cira Centre
Philadelphia, PA 19104

      Attorneys for Appellant James

Jeffrey M. Paladina [ARGUED]
Pennsylvania Department of Corrections
Office of Chief Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050

      Attorney for Correctional Appellees

John J. Hatzell, Jr.
Haddix & Millman
1650 Market Street 39th Floor
Philadelphia, PA 19103

Damaris Garcia [ARGUED]
Haddix & Millman
309 Fellowship Road, Suite 200
Mount Laurel, NJ 08054

      Attorney for Medical Appellees

_____

[1] Law student admitted under L.A.R. 46.3.

OPINION[*]

_____

SHWARTZ, Circuit Judge.[2]

Paris James sued medical professional Defendants Jennifer Daya and Brian Davis for deliberate indifference to his medical needs. The District Court granted summary judgment in their favor. Because material disputes of fact prohibit summary judgment, we will vacate and remand.[3]

I

A[4]

This case arises out of events that occurred in Fall 2012, before, during, and after James' transfer to the State Correctional Institution ("SCI") in Coal Township,

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[2] The Court extends its gratitude to James' pro bono counsel for their excellent work on this appeal.

[3] James also sued corrections officers and medical professionals Matt Hyde and Lori Alleman and appealed the orders granting summary judgment to them. James dismissed his appeal of certain aspects of those orders after oral argument. As a result, this opinion addresses only the deliberate indifference claim against certain medical defendants.

[4] The facts are based on documents, discovery responses, and James' verified amended complaint, First Am. Compl. ("FAC"), which we treat as an affidavit to the extent its allegations are based upon personal knowledge and facts that would be admissible in evidence. Revock v. Cowpet Bay W. Condo. Ass'n, 853 F.3d 96, 100 n.1 (3d Cir. 2017). The District Court largely accepted Defendants' version of events without considering James' detailed, nonconclusory factual account of his interactions with Defendants and his medical condition. See Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009) (noting a court may disregard sworn statements if they are "conclusory" and "self-serving").

Pennsylvania ("SCI-Coal"). James states that he was "snatched" out of a transport van, "pinned [] against a wall," "dragged [] from cell to cell," and provided insufficient medical care. FAC ¶ 69, Reply Br. at 12.

1

A few days before his transfer from the SCI in Forest County, Pennsylvania ("SCI-Forest") to SCI-Coal, James collapsed due to dehydration and was treated with intravenous fluids. The following day, a nurse at SCI-Forest medically cleared James for transfer.

On October 11, 2012, James was transferred from SCI-Forest to SCI-Coal. Corrections officers Kevin Mains and John Schmerfeld oversaw part of the transfer and deemed James "medically fit for transport" based on a "visual assessment." JA340. James claims that during the transport, he was coughing, wheezing, sweating, gasping for air, and struggling to maintain his balance. James informed Mains and Schmerfeld that he was dizzy, felt faint, and needed his asthma inhaler and medical treatment.

Upon arrival at SCI-Coal, Mains and Schmerfeld ordered James out of the van. James says he was unable to leave the van under his power, so he did not exit. James asserts that the officers "snatched" him out of the van by his handcuffs, FAC ¶¶ 68-69, but they assert that no force was used to remove James from the van. James does not claim he suffered any injury, although he says the force the officers used made it more difficult for him to breathe and caused his heart rate to "sky rocket[]." FAC ¶ 69.

2

After James was removed from the van, he was ushered to an intake area and ordered into a line. James states that he was unable to stand, so he sat down on a chair "off to the side of the [intake] line." FAC ¶¶ 70-71. Corrections officers Scott Segedy and Rod Romig ordered James to stand and re-join the line. James asserts that when he told them he was having an asthma attack, they responded that they "didn't give a f---." FAC ¶ 73. According to James, Segedy and Romig then "grabbed [James] out of the chair," "pinn[ed] [him] against the wall," "press[ed] . . . on [his] chest," and yelled at him that he was "getting off on the wrong foot." FAC ¶¶ 78, 80. Art Masser, a supervisor, allegedly saw the exchange and asked James, "what is your f------ problem?" FAC ¶ 83. James states that throughout the incident, he continued to wheeze, gasp for air, cough, and inform the officers that he needed his asthma inhaler and medical care. James recalls Masser telling him not to "make [his] stay here harder than it needs to be" and that he would "show [James] who's in control." FAC ¶¶ 91, 99. These officers deny that they made any remarks or used force or that James exhibited signs of illness.

3

Masser ordered the other officers to place James in a holding cell, where James claims he collapsed. James pulled himself up, however, when corrections officers Brock Baker, Schoch, and Masser arrived to transfer him to a restricted housing unit ("RHU") and ordered him to stand and submit to restraints in preparation for the move. Masser ordered James to walk to the RHU, but James refused, explaining he felt physically incapable of doing so, and so Baker and Schoch "drag[ged]" him to the RHU. FAC ¶

118. James says that he requested medical care, but the officers deny that he made such request. The officers state that they "escorted" James because he was uncooperative, but that they used no force and James had no difficulty walking. JA343.

At the RHU, James was placed in a "holding cell strip cage" and strip-searched. FAC ¶ 122. James asserts that he again requested medical attention. At Masser's direction, Matt Hyde, a registered nurse, visually examined James from outside of the holding cell. James says that he told Hyde that he was dehydrated, off balance, had trouble breathing, and "needed his asthma inhaler," FAC ¶¶ 127-28. According to James, Masser and Hyde discussed admitting James to the infirmary but decided against doing so because there was no room for him. Instead, they advised James to sign up for a sick call, noting that the morning medical shift would have to decide whether to admit James to the infirmary and make space if necessary.

James alleges that Masser, Baker, and Schoch then "dragged" him from the strip cage and "thr[e]w" him into an RHU cell. FAC ¶¶ 137-38. The officers deny that any force was used. James claims he collapsed on the floor and was unable to retrieve his food tray. That evening, non-party Bonita Carstetter, a registered nurse, checked on James and conducted an intake questionnaire, which noted that James had asthma, took no medications, and was hearing voices. Carstetter scheduled James for a chronic care clinic and psychiatric clinic. James also asserts that he requested medical care from Lori

6

Alleman, a registered nurse who was distributing medications to other inmates.[5]  He recalls her telling him that she was only there to pass out medications and he would have to sign up for sick call.  James signed up for a sick call.

On James' second day at SCI-Coal, Defendant Jennifer Daya, a physician assistant, evaluated James pursuant to his request for a sick call.  James told Defendant Daya that he felt weak, recently lost 35 pounds, and had been vomiting.  Defendant Daya reviewed James' medical records and ordered both lab testing and that James be monitored.

Later that day, corrections officers Neil Novallis and Paul Goodwin escorted James to the showers, where James says he "nearly collapsed" due to the heat and steam.  FAC ¶ 163.  James states that he again requested medical attention but did not receive it.  That evening, James claims that he also requested medical attention from Masser after he was again unable to retrieve his food tray and requested another "sick-call slip" from corrections officer Damien Kratz.  FAC ¶ 171.  James asserts that both requests were denied.  The officers dispute that James exhibited signs of illness and that he requested medical attention.

---

[5] In his verified amended complaint, James incorrectly identifies Alleman as Defendant Patricia Kulenguskey, in whose favor the District Court granted summary judgment because her timesheets indicate she was not at the facility on the night in question, see James v. Varano, No. 14-cv-01951, 2018 WL 1453193, at *12 (M.D. Pa. Mar. 23, 2018.  James has not challenged the ruling in Kulenguskey's favor on appeal.  Although Alleman's name is spelled "Alderman" in the caption, "Alleman" is the correct spelling per her discovery responses.

On his third day at SCI-Coal, James states that he requested medical attention from corrections officers Arthur Rodriguez and Burrows when he again "did not accept his [food] tray." FAC ¶ 173. James asserts that he also "pressed his emergency call button" and notified the medical department of his request for immediate medical attention. FAC ¶ 178. James claims that he also asked corrections officer Timothy Krzykowski for immediate medical attention that morning.[6]

James contends that he then spent the "next [four] days laying dying . . . on the floor of his cell," FAC ¶¶ 183-84, and during that time "was continu[ously] . . . deprived access to medical care by each officer through their refusal to notify medical of [James'] serious and immediate medical needs," and was denied "sick-call forms . . . to follow sick-call procedures [and] request care." FAC ¶ 183.

On October 17, 2012, Defendant Brian Davis, a physician assistant, evaluated James as part of an asthma clinic. James told Defendant Davis that he felt shortness of breath, weakness, and chest tightness. Defendant Davis diagnosed James as having "[m]ild intermittent" asthma, JA333, and ordered blood work, a chest x-ray, and an asthma inhaler.

James asserts that the following day, Novallis "physically drag[ged] and carr[ied] [James]" to a meeting with the Program Review Committee ("PRC") concerning his

---

[6] Defendants contend that Krzykowski, whose name is spelled on the caption as "Krzowki," did not work that day, which is supported by Krzykowski's time sheets. The District Court granted summary judgment to Krzykowski accordingly, see James, 2018 WL 1453193, at *12, and James does not challenge the ruling on appeal.

custody status. FAC ¶ 189. After they arrived, PRC member Deputy Superintendent Luscavage ordered that James receive medical attention after he observed that James "had a white substance around his mouth" and was informed that James had not eaten for three days. JA328. As a result, James was escorted to the infirmary. At the infirmary, James had "foamy mucous coming from his mouth" and was taken to the Shamokin Area Community Hospital. JA349. At the hospital, James was treated for "acute exacerbation of asthma," discharged, and returned to the SCI-Coal infirmary a few hours later. JA349. James began feeling better the following day, was offered but declined an inhaler, and remained in the infirmary for five days, during which time he was diagnosed with hyperthyroidism. James was then discharged back into the general population, assigned to a Special Needs Unit ("SNU"), and provided a temporary privilege of having no cellmate.

4

After he returned to the general population, James filed grievances concerning the purported denial of medical care and sent letters to staff at the Pennsylvania Department of Corrections Central Offices reporting his perceived inadequate medical treatment.

B

James filed a pro se verified complaint, bringing claims under 42 U.S.C. § 1983 against, among others, Defendants Daya and Davis for deliberate indifference to his medical needs.

After the close of discovery, these Defendants moved for summary judgment.

9

James opposed the motion and moved for the appointment of counsel.[7]  The District

Court denied the counsel motion and granted summary judgment for Defendants on

James' deliberate indifference claims.  James v. Varano, No. 14-cv-01951, 2018 WL

1453193, at *5, *12 (M.D. Pa. Mar. 23, 2018).

James appeals.[8]

II[9]

The District Court erred in granting summary judgment to Defendants on James'

deliberate indifference claim.  "[P]rison officials violate the Eighth Amendment when

they act deliberately indifferent to a prisoner's serious medical needs."  Pearson v. Prison

Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (citing Estelle v. Gamble, 429 U.S. 97,

104-05 (1976)).  To prove this claim, a plaintiff must show that: (1) "the defendants were

---

[7] James also moved for the appointment of counsel when certain defendants moved to dismiss the complaint and after the motion was denied.  The District Court denied both motions.

[8] We review a district court's order granting summary judgment de novo, Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013), and we view the facts and make all reasonable inferences in the non-movant's favor, Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In making the determination whether a genuine issue of material fact exists, all reasonable inferences from the [evidence] must be drawn in favor of the non-moving party."  Reese v. Sparks, 760 F.2d 64, 67 (3d Cir. 1985).  The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[9] The District Court had jurisdiction under 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1291.

deliberately indifferent to [his] medical needs" and (2) "those needs were [objectively] serious." Id. (quotation marks omitted).

A prison medical professional acts with "deliberate indifference" towards an inmate's medical needs when he or she "knows of" and "recklessly disregard[s]" an "excessive risk to [the] inmate['s] health." Farmer v. Brennan, 511 U.S. 825, 836-37 (1994). The deliberate indifference prong considers, among other things, the adequacy of care. Pearson, 850 F.3d at 536-39, 542. The deliberate indifference prong also requires showing that a defendant subjectively appreciated the risk of harm without proper care but ignored the risk or delayed providing care for a nonmedical reason. Id. at 537-38. Expert testimony may be helpful to examine the adequacy of care, but experts are not required when the facts permit a layperson to judge whether the care was clearly substandard. Id. at 537-38.

There is no dispute that (1) James was medically cleared before he was transported to SCI-Coal; (2) upon arrival, Hyde visually examined James, listened to James' complaints of strained breath, weight loss, and dehydration, and advised James to sign up for a sick call, which James did; (3) an evening nurse checked on James and conducted an intake questionnaire, which noted that James had asthma, took no medications, and was hearing voices, and scheduled James for a chronic care clinic and a psychiatric clinic; (4) James requested care from Alleman and she told him she was only in the area to distribute medication and to sign up for a sick call; (5) Defendant Daya evaluated

11

James the following morning,[10] reviewed James' medical records, and ordered both lab testing and monitoring in response to his complaints of weakness, weight loss, nausea, "gasping, coughing, and whe[e]zing," FAC ¶ 157; and (6) Defendant Davis evaluated James days later, assessed him as having "[m]ild intermittent" asthma, JA333, and ordered blood work, a chest x-ray, and an asthma inhaler. There is, however, no evidence that he received any treatment during these encounters or that either Defendant ensured that he received treatment. Moreover, although Defendants deny it, James states that from October 13 to 16, he made several requests for medical attention, but those requests were ignored.

Viewing the disputed facts, as we must, in James' favor, the asserted failure to provide treatment for James' apparent breathing problems and inaction in response to James' requests for care demonstrate that the District Court erred in granting summary judgment in favor of Defendants Daya and Davis on James' deliberate indifference claim.

### III

For the foregoing reasons, we will vacate the District Court's order granting summary judgment to Defendants Daya and Davis, affirm its orders denying the

---

[10] Whether Defendants Daya and Davis physically entered James' cell or "interacted with [him] . . . through the cell door," James Br. at 31, is inconsequential. James has not shown that adequate medical care cannot be provided through a cell door, nor does precedent automatically require more. See Pearson, 850 F.3d at 542 (holding no deliberate indifference when prison doctor initially treated inmate over the phone); Farmer, 511 U.S. at 844-45 (recognizing that the deliberate indifference standard balances prison security and providing medical care).

12

appointment of counsel,[11] and remand for further proceedings consistent with this

opinion.

---

[11] The District Court acted within its discretion in denying James' requests for appointed counsel. "Indigent civil litigants possess neither a constitutional nor a statutory right to appointed counsel," but district courts have "broad discretion to determine whether appointment of counsel in a civil case would be appropriate." Montgomery v. Pinchak, 294 F.3d 492, 498 (3d Cir. 2002) (quotation marks omitted); see also 28 U.S.C. § 1915(e). In exercising this discretion, district courts should first "assess whether the claimant's case has some arguable merit in fact and law." Montgomery, 294 F.3d at 498-99. If so, courts then consider: (1) "the plaintiff's ability to present his or her own case," which can be demonstrated by the plaintiff's "prior litigation experience," (2) "the difficulty of the particular legal issues," (3) "the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue investigation," (4) "the plaintiff's capacity to retain counsel on his or her own behalf;" (5) "the extent to which a case is likely to turn on credibility determinations," and (6) "whether the case will require testimony from expert witnesses." Id. at 499, 501 (quoting Tabron v. Grace, 6 F.3d 147, 155-57 (3d Cir. 1993)).

The District Court correctly concluded that James' claims have arguable merit, but that the factual and legal issues are relatively uncomplicated, and James showed an ability to present them. James has filed a verified complaint and verified amended complaint alleging claims that survive summary judgment, briefed motions following local rules and attaching relevant exhibits, moved for a preliminary injunction, served relevant and articulate interrogatories and requests for admission, and brought and won a motion to compel discovery, see James, 2017 WL 895569, at *5-6. Moreover, although there are credibility issues in the case, James is an experienced pro se litigant. See, e.g., James v. Chesney, No. 02-cv-00995 (W.D. Pa.) (habeas petition); James v. Sauers, No. 14-cv-00069 (W.D. Pa.) D.E. 5 (Complaint) ¶¶ 147 (retaliation), 152 (deliberate indifference), 155 (excessive force); James v. Sauers, No. 14-cv-00069, 2019 WL 5212443, at *2 (W.D. Pa. Oct. 16, 2019) (granting default judgment). Finally, as James concedes, his claims do not require expert witness testimony. Thus, the District Court did not abuse its discretion in denying James' motions for appointed counsel. We express no opinion as to whether the District Court, in its sound discretion, decides to appoint counsel for trial or any other purpose it deems warranted. See Houser v. Folino, 927 F.3d 693, 700 (3d Cir. 2019).