Joel E. **DURMER**

v.

Dr. J. **O'CARROLL**, M.D.; Robert C. **Barker**; William **Fauver**,

Joel Durmer, Appellant.

No. 92-5068.

United States Court of Appeals, Third Circuit.

Argued Sept. 17, 1992.

Decided March 30, 1993.

Philip J. Moran, Robert J. Haney (argued), West Trenton, NJ, for appellant.

Robert J. Del Tufo, Atty. Gen., Mary C. Jacobson, Deputy Atty. Gen., Deborah J. Gottlieb (argued), Howard J. McCoach, Deputy Attys. Gen., Trenton, NJ, for appellees.

Before STAPLETON, SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

This appeal arises out of the district court's grant of summary judgment for defendants in a civil rights action brought by plaintiff Joel Durmer, an inmate in the New Jersey correctional system. Mr. Durmer claims that the defendants violated his civil rights through their deliberate indifference to his medical needs during his period of incarceration. The district court concluded that, as a matter of law, no deliberate indifference was present here and thus, summary judgment in favor of the defendants was appropriate. For the reasons outlined below, we disagree with this conclusion with respect to defendant O'Carroll and will reverse and remand for further proceedings.

### I.

In March 1987, Durmer suffered a cerebral vascular incident which caused his left leg to drag and weakness in his left arm. In June 1987, he was involved in an automobile accident which caused, among other things, an injury to his back. On October 1, 1987, Durmer allegedly suffered another stroke which further weakened his left leg and arm. On October 2, 1987, Durmer began his period of incarceration in the New Jersey prison system, a period which ended with his release on April 10, 1989.

Prior to his incarceration, Durmer was treated by Dr. Campollataro, an orthopedic

physician. At Dr. Campollataro's orders, Durmer had received extensive physical therapy until the date of his incarceration. Durmer's first six months in the New Jersey prison system were spent in the Ocean County jail. There, he was permitted to use a TENS unit (transcutaneous electrical stimulator) and a cane, but was unable to continue with the physical therapy prescribed by Dr. Campollataro.[1] Allegedly, upon notifying the prison authorities of his need for physical therapy, Durmer was told that such therapy was unavailable at the County jail but would be available once he was transferred to the state system. Durmer claims that his condition deteriorated during his time at the Ocean County jail.

On April 22, 1988, Durmer was transferred to the Yardsville Correctional Center where he saw Dr. DelCastillo, a psychiatrist, who examined him and concluded that his medical complaints were valid. On or about May 5, 1988, Durmer was transferred to Mid–State Correctional Facility where he remained for the duration of his incarceration. Shortly after that date, Durmer saw Dr. O'Carroll, the physician-in-charge at Mid–State and advised him of his physical problems. In particular, Durmer told Dr. O'Carroll of his strokes, his increasing left-side weakness, and his immediate need for physical therapy pursuant to Dr. Campollataro's orders.[2]

Dr. O'Carroll did not reinstitute any physical therapy but instead chose to wait for Durmer's medical records to arrive and send him for further examination. On June 29, 1988, Durmer was sent to the Trenton State Prison–Neurology Clinic where he was examined by a neurologist, Dr. Chaudry. Dr. Chaudry's report indicated that Durmer had, in the past, suffered a stroke and it concluded with two recom-

mendations. First, it recommended physical therapy and second, it recommended that Durmer also see a neurosurgeon to examine Durmer's back problems and explore the possibility of disc disease. Durmer did not receive physical therapy, however. Instead, Dr. O'Carroll sent Durmer to see a neurosurgeon, Dr. Scheuerman, on July 6, 1988.[3] Dr. Scheuerman recommended a bed board and medication with Motrin. Allegedly, he also told Durmer that physical therapy would not be effective more than 15–18 months after a stroke, and that water therapy (one of the forms of therapy originally recommended by Dr. Campollataro) was not available in prison.

Over the next three months, Durmer continued to complain about the lack of physical therapy to Dr. O'Carroll and allegedly wrote letters expressing the same complaints to Mr. Barker (the warden of Mid–State) and Mr. Fauver (the State Commissioner for Corrections). He claims that his condition grew progressively worse over that period as he lost movement in his left leg and foot. In October 1988, Dr. O'Carroll sent Durmer to see Dr. Scheuerman again, apparently to evaluate whether physical therapy would be effective. Dr. Scheuerman recommended that Durmer see a physiatrist [4] regarding physical therapy and that he use his TENS unit full time.[5] Pursuant to the first part of this recommendation, Dr. O'Carroll sent Durmer to be evaluated by Dr. Carabelli, a physiatrist, on November 9, 1988. Dr. Carabelli recommended an orthotic device for Durmer's left foot and a limited three-week physical therapy program to instruct and train Durmer in the use of that device. However, Dr. Carabelli recommended against any other physical therapy because, at that point, too much time had

---

1. The physical therapy prescribed by Dr. Campollataro apparently included the use of an exercycle, active massages, and water therapy.

2. The warden of Mid–State at this time was Robert Barker, and the State Commissioner for Corrections was William Fauver. Both Barker and Fauver are named defendants in this suit.

3. At his deposition, Dr. O'Carroll claimed that the reason for this was to rule out disk disease

before beginning physical therapy and thereby prevent further injury.

4. A physiatrist is a physician specializing in physical therapy.

5. Durmer refused to use the TENS unit as recommended by Dr. Scheuerman.

elapsed for the therapy to be effective.[6] Durmer did receive the orthotic device, but never was given the three-week program suggested by Dr. Carabelli, nor, for that matter, any other physical therapy.

Durmer contends that the defendants' failure to provide the appropriate physical therapy during his stay in the New Jersey prison system caused him to lose substantial use of his left leg and foot. This contention forms the basis of Durmer's § 1983 action against O'Carroll, Barker, and Fauver.

## II.

The district court properly exercised jurisdiction over Durmer's suit pursuant to 28 U.S.C. § 1343. We have jurisdiction over the district court's grant of summary judgment for the defendant pursuant to 28 U.S.C. § 1291.

■ Summary judgment is only appropriate where "there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)). Our review of a grant of summary judgment is plenary. *Jefferson Bank v. Progressive Casualty Insurance Co.*, 965 F.2d 1274, 1276 (3d Cir.1992).

## III.

■ Although prison systems have a duty to provide prisoners with adequate medical care, *see, e.g., Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("[I]t is but just that the public be required to care for the prisoner who cannot by reason of deprivation of liberty care for himself."), the law is clear that simple medical malpractice is insufficient to present a constitutional violation. *See id.* at 106, 97 S.Ct. at 292. Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners. *See Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979); *see also White v. Napoleon*, 897 F.2d 103, 110 (3d Cir.1990) ("Certainly, no claim is presented when a *doctor* disagrees with the professional judgment of another doctor. There may, for example, be several ways to treat an illness."). In order to succeed in an action claiming inadequate medical treatment, a prisoner must show more than negligence; he must show "deliberate indifference" to a serious medical need. *See Estelle*, 429 U.S. at 104–06, 97 S.Ct. at 291–92;[7] *see also Monmouth County Correctional Institution Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir.1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).

The district court concluded that Dr. O'Carroll's conduct in sending Durmer to several different specialists and providing of some treatment precludes a finding of deliberate indifference. According to the court, this case is simply an instance of a treating physician opting for a different course of treatment than that suggested by another physician. While this may be one reasonable reading of the record in this case, we cannot conclude that it is the only one.

■ At the time Dr. O'Carroll first saw Durmer, Durmer had already spent over seven months in the New Jersey prison system without receiving the physical ther-

---

**6.** At that point, 20 months had elapsed from the first stroke, and 13 months had elapsed since the second alleged stroke.

**7.** The district court concluded that Durmer's medical needs clearly were serious, and the defendants do not appear to contest this conclusion on appeal.

apy prescribed by his pre-incarceration physician, despite Durmer's repeated notification to the authorities of his deteriorating condition and his need for immediate therapy. Because it is undisputed that physical therapy must take place within approximately eighteen months of a stroke to be effective, time was of the essence. Rather than beginning physical therapy after examining Durmer and receiving his medical records, Dr. O'Carroll opted to send Durmer to a neurologist for an expert evaluation. The neurologist, Dr. Chaudry, specifically recommended physical therapy. Yet, Dr. O'Carroll chose to ignore this recommendation for over four and a half months. During this time, he instead sent Durmer to other doctors, none of whom ever explicitly suggested that physical therapy would be inappropriate. While a reasonable trier of fact might believe Dr. O'Carroll's explanation that these evaluations by other doctors were, in his judgment, medically desirable before beginning physical therapy,[8] it might also reject this explanation as merely a pretext for avoiding physical therapy.[9] There is some evidence in the record sug-

gesting that Dr. O'Carroll might have had a motive for deliberately avoiding physical therapy, namely, that physical therapy would have placed a considerable burden and expense on the prison and was therefore frowned upon throughout the prison health system.[10]

In *Lanzaro*, we noted that deliberate indifference could exist in a variety of different circumstances, including where " 'knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care' " or where "[s]hort of absolute denial ... 'necessary medical treatment [i]s ... delayed for nonmedical reasons,' " or where " 'prison authorities prevent an inmate from receiving recommended treatment.' " *Lanzaro*, 834 F.2d at 346 (citations omitted).[11] Under the circumstances present in this case, we cannot conclude as a matter of law that Dr. O'Carroll's conduct did not run afoul of the *Lanzaro* standard. Indeed, we note that defendants rely not so much on a suggestion that the treatment provided Durmer

**8.** The reason Dr. O'Carroll sent Durmer to a neurosurgeon, on Dr. Chaudry's recommendation, was to rule out the possibility of disk disease. Dr. O'Carroll claims that he wanted to rule out disk disease before beginning physical therapy because disk disease might be the cause of all Durmer's problems and/or might be aggravated by physical therapy. There appears some reason to question this explanation, however. Dr. Chaudry's recommendation made no mention of the neurosurgical evaluation having to take place *before* physical therapy. Durmer had, in fact, had several months of physical therapy before entering prison. Perhaps more importantly, the neurosurgeon ultimately does not appear to have diagnosed Durmer as having disk disease; although the neurosurgeon's report did not recommend physical therapy, it also in no way suggested that physical therapy would be inappropriate or harmful.

**9.** According to Defendants' own brief, "Dr. O'Carroll sent [Durmer] to consultant after consultant in order to establish what his specific problems and needs were, and ultimately sent him to a physiatrist for physical therapy...." While this might, as defendants suggest, indicate that Dr. O'Carroll was "conscientiously ... [trying] to determine whether [Durmer] really needed physical therapy or whether physical therapy might actually inflict more damage," it might also reasonably be viewed as an intentional delaying tactic designed to avoid having

to provide physical therapy until it was too late. Diagnosis is not equivalent to treatment; a defendant might be deliberately indifferent to a prisoner's specific medical needs regardless of how many doctors he sends him to for diagnosis.

**10.** In his deposition, Dr. O'Carroll testified that in order for Durmer to get physical therapy "the patient would have to go out [of the Mid–State Facility]. Arrangements would have to be made for his transportation. It would have to be cleared by Trenton most likely." Durmer, in his affidavit, also claims that Dr. Scheuerman, the neurosurgeon, told him that water therapy was not available in prison, and that he personally did not believe in physical therapy for prisoners. Durmer additionally alleges that a nurse told him that "this is jail. This is not the real world, you can forget physical therapy."

**11.** Durmer also relies on two other examples of deliberate indifference cited by *Lanzaro:* "[w]here prison authorities deny reasonable requests for medical treatment ... and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury' " and "where prison officials erect arbitrary and burdensome procedures that 'result[ ] in interminable delays and outright denials of medical care to suffering inmates.' " *Lanzaro*, 834 F.2d at 346–47 (citations omitted).

---

was adequate and appropriate,[12] but rather that if it was inappropriate, it was no more than mere negligence. However, if we assume that Durmer received inadequate medical care, Dr. O'Carroll's intent becomes critical: if the inadequate care was a result of an error in medical judgment on Dr. O'Carroll's part, Durmer's claim must fail; but, if the failure to provide adequate care in the form of physical therapy was deliberate, and motivated by non-medical factors, then Durmer has a viable claim. It is therefore important that the trier of fact hear Dr. O'Carroll's testimony in order to assess his credibility, and that Durmer's counsel be permitted to explore the doctor's motivation on cross-examination.[13]

 While we believe summary judgment was improperly granted with respect to Dr. O'Carroll, we believe that summary judgment was proper with respect to defendants Barker and Fauver. The only allegation against either of these two defendants was that they failed to respond to letters Durmer sent to them explaining his predicament.[14] Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.

## IV.

Accordingly, the district court's order granting defendants' motion for summary judgment will be affirmed with respect to defendants Fauver and Barker. Because we believe that a reasonable trier of fact could conclude that Dr. O'Carroll was deliberately indifferent to Durmer's medical need for physical therapy and that this

indifference caused Durmer's physical injury, we will reverse that portion of the district court order which granted summary judgment for Dr. O'Carroll and will remand for further proceedings.

SCIRICA, Circuit Judge, dissenting.

Because I find no evidence of deliberate indifference to a serious medical need on the part of Dr. O'Carroll, I would affirm the judgment of the district court.

Before his incarceration, Durmer was examined and treated by his own doctor, Dr. Campollataro. From October 2, Durmer was incarcerated in an interim facility where he received no physical therapy. Five months later, he was transferred to yet another facility where he received no physical therapy. Finally, on or about May 5, 1988, six months after his last stroke, Durmer was transferred to the Mid–State Correctional Facility. Dr. O'Carroll's first examination occurred shortly thereafter.

As the majority notes, Durmer told O'Carroll of his strokes, his left-side weakness, and his need for physical therapy. Because Dr. O'Carroll had no records of Durmer's medical history, he waited for Durmer's full medical records to arrive before prescribing treatment. After receiving and reviewing the records, Dr. O'Carroll referred Durmer to a neurologist to determine the appropriate treatment.

On June 29, 1988, Durmer was examined by Dr. Chaudry at the Neurological Clinic at Trenton State Prison. Dr. Chaudry recommended physical therapy and an evaluation by a neurosurgeon to rule out disc disease as the cause of Durmer's problem. Dr. O'Carroll testified that he feared that if disc disease were the root of Durmer's

---

**12.** None of the specialists to whom Durmer was referred have ever stated that physical therapy would have been inappropriate, and the reports of both Dr. Chaudry and Dr. Carabelli suggest that physical therapy would have been effective if administered promptly after Dr. Chaudry's recommendation.

**13.** We do not mean to suggest that a plaintiff is entitled to a trial anytime he can present a genuine issue of fact as to whether the care provided was adequate. Clearly, there must

also be a genuine issue of fact regarding the defendant's intent. We hold only that, in light of the surrounding circumstances, there is a triable issue of fact as to whether Dr. O'Carroll knew that Durmer should receive physical therapy and deliberately failed to provide it for non-medical reasons.

**14.** Respondeat superior is, of course, not an acceptable basis for liability under § 1983. *See, e.g., Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981).

problem, physical therapy might cause further injury. Therefore, he had Durmer evaluated by a neurosurgeon, Dr. Scheuerman, on July 6, 1988—about a week later. Dr. Scheuerman concluded that Durmer had a clot in a blood vessel in his brain and recommended a bed board and continuous medication with Motrin. Dr. Scheuerman's written recommendations did not include physical therapy. It appears that Dr. O'Carroll followed Dr. Scheuerman's recommendations. As the majority notes, Durmer testified that Dr. Scheuerman told him physical therapy would not be effective more than 15 to 18 months after a stroke and that water therapy was not available in prison.

Durmer continued to complain to Dr. O'Carroll about his need for and failure to receive physical therapy. Dr. O'Carroll sent Durmer back to Dr. Scheuerman specifically for a recommendation regarding physical therapy. On October 12, 1988, Dr. Scheuerman recommended that Durmer use the TENS unit and see a physiatrist regarding physical therapy. Ignoring Dr. Scheuerman's recommendation, Durmer refused to use the TENS unit as prescribed and signed a statement accepting "full responsibility" for his decision.

Dr. O'Carroll then sent Durmer to see a physiatrist, Dr. Carabelli on November 9, 1988. Dr. Carabelli prescribed an orthotic device for Durmer's left foot and ankle, with three weeks of physical therapy to train him in the use of that device. Durmer testified that he never received the three-week therapy. Dr. Carabelli did not recommend any additional physical therapy because he believed it was too long after Durmer's stroke to do any good.

I can discern no evidence of deliberate indifference on the part of Dr. O'Carroll. The suggestion that Dr. O'Carroll intentionally delayed physical therapy by referring Durmer to specialists is speculation. When Dr. O'Carroll first examined Durmer in May 1988, it appears from the record that the last recommendation for physical therapy occurred before October 2, 1987, the date Durmer was incarcerated. It seems reasonable that a treating physician examining a patient in May 1988 would not rely on the patient's request for a specific treatment, based on his doctor's recommendation some eight months earlier, but would first want to examine the medical records and then refer the patient to a specialist. Dr. O'Carroll sent Durmer to two specialists and largely followed their recommendations. Dr. O'Carroll also offered evidence that he instructed Durmer on exercises to rehabilitate his back and promptly treated several other ailments.[1] I see no evidence that Dr. O'Carroll delayed necessary medical treatment for non-medical reasons.

At most Durmer has presented evidence of medical malpractice. It is well-established that medical malpractice alone does not violate the Eighth Amendment. *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *see White v. Napoleon*, 897 F.2d 103, 110 (3d Cir.1990) (recognizing the "well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims"). Because I find no evidence of deliberate indifference on the part of Dr. O'Carroll to any of Durmer's medical needs, I respectfully dissent.

---

1. In May 1988, shortly after his transfer to Mid–State, Durmer complained of an ulcer. Dr. O'Carroll promptly examined him, ordered a UGI, and prescribed Persantine and Zantac. A month later, Durmer complained of a dark bowel movement and a fungus rash. Dr. O'Carroll examined Durmer, found no sign of a gastrointestinal problems, and prescribed a treatment cream for the rash. In September 1988, Durmer complained of pain in his right knee. Dr. O'Carroll sent him to an orthopedist, Dr. Wang, who prescribed use of a hinged knee brace and ordered an arthrogram. O'Carroll also examined Durmer's back several times, prescribed exercises to strengthen it, and—according to Durmer's testimony—"tried two or three different type [sic] of medications" to treat his ailment.