NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1224
_____

MICHAEL K. MILLER,
                            Appellant

v.

CAROL STEELE-SMITH, Deputy Warden;
SOUTHERN HEALTH PARTNERS; BEAVER COUNTY;
BETH HARRIS, MSM; BETTY WEGNER, RN; ANGELA PUGH, LPN
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-15-cv-00662)
Magistrate Judge:  Honorable Lisa P. Lenihan
_____

Submitted Under Third Circuit LAR 34.1(a)
October 12, 2017

Before:  CHAGARES, JORDAN, and FUENTES, *Circuit Judges.*

(Filed: November 6, 2017)
_____

OPINION[*]
_____

JORDAN, *Circuit Judge*.

Michael Miller appeals from the grant of summary judgment against him on his

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

claims that Southern Health Partners, Beth Harris, and Betty Wegner (collectively, the "Defendants") violated his Eighth and Fourteenth Amendment rights.[1] Miller claims that the Defendants were deliberately indifferent to the wrist fracture he suffered in a car crash that resulted in his arrest and incarceration for driving under the influence. For the reasons that follow, we will affirm.

## I.    Factual Background[2]

On the night of May 23, 2013, Miller was driving under the influence of alcohol and prescription medications, and he crashed his car. Police officers arrived at the scene of the accident and, after tracking Miller to a residence he had fled to on foot, arrested him for driving under the influence. The police then transported Miller to the Heritage Valley Emergency Department. At the time of the arrest, Miller had two prior DUI convictions and was on parole. His criminal behavior and arrest that night constituted a violation of his parole.

---

[1]  Miller had a dual status when he was detained at Beaver County Jail: he was both a pre-trial detainee and a parole revocee. Case law makes clear that pre-trial detainees are protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003). It is unclear whether the Eighth or Fourteenth Amendment affords protections to parole revocees, but we need not address that issue now. Because a Fourteenth Amendment claim for inadequate medical care is analyzed pursuant to the same standard applied to an Eighth Amendment claim, we will analyze Miller's claim in accordance with that familiar framework. *See id.* at 581-82 (explaining "that the Fourteenth Amendment affords pretrial detainees protections at least as great as the Eighth Amendment" and proceeding to evaluate a pretrial detainee's claim under the Eighth Amendment framework) (internal quotation marks and citation omitted).

[2]  When evaluating summary judgment, we view the facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

The Heritage Valley Emergency Department Report noted that Miller had abrasions on his left hand and complained only of mild lumbar back pain. The report did not mention an injury to Miller's left wrist. Heritage Valley discharged Miller to the police, who transported him to Beaver County Jail ("BCJ"). Miller was, he says, in a "blackout" state of intoxication at the time and thus has minimal recollection of the events that transpired between his accident and his arrival at BCJ.

Nurse Angela Pugh examined Miller the following morning, May 24, as part of BCJ's medical intake screening. Pugh's notes on the screening form stated, in relevant part, that Miller had cuts to his left hand and was under the influence of alcohol. Although Pugh circled "Y" next to the prompt asking if the inmate showed "visible signs of ... injury ... or other symptoms suggesting the need for immediate emergency medical referral," she wrote that Miller had been "cleared" by the hospital. (App. at 113.) Pugh did not note an injury to Miller's left wrist on the screening form. Miller completed a medical information release form authorizing Heritage Valley to release his medical records, including "any/all x-ray/lab results," to BCJ. (App. at 45.) That same day, Dr. Earnie Bonatatibus prescribed for Miller two medications: Flexeril and Motrin. BCJ's medication administration record reflects that Miller received those drugs, as prescribed, on May 24, 25, 26, and 27.[3] Dr. Bonatatibus also issued an order on May 26 for Miller to be provided with an extra blanket to elevate his left arm.

---

[3] Miller disputes the records showing that he received his pain medication every day he was housed at BCJ. (App. at 83 ("I know I was in a great deal of pain and didn't receive pain medication for at least a week at the jail. I don't believe I received anything.").) Putting aside the fact that Miller's language falls short of a complete denial,

3

On May 28, Dr. Bonatatibus examined Miller and instructed the medical staff to request Miller's medical records from Heritage Valley to determine if the hospital had performed an x-ray of his left wrist. The doctor instructed that, if not already performed, an x-ray of Miller's left wrist should be scheduled. Betty Wegner, a registered nurse at BCJ, acknowledged Dr. Bonatatibus's order in writing, and BCJ's Medical Services Manager, Beth Harris, noted the instructions on Miller's progress notes. Dr. Bonatatibus also discontinued Miller's Motrin, and prescribed him Naproxen and Tylenol. BCJ's records reflect that Miller received his medications, as prescribed, on May 28, 29, 30, and 31.

Heritage Valley faxed Miller's medical records to BCJ on May 28, which confirmed no left wrist x-ray had been taken during his May 23 visit.[4] Although the fax to BCJ was dated May 28, and a handwritten note by an unidentified individual confirmed that the records were received on May 28, Harris did not make a notation on Miller's progress notes that the fax was received until May 31. Accordingly, Dr. Bonatatibus was not informed that a left wrist x-ray had not been performed until May 31, when he again ordered an x-ray. That same day, Harris scheduled the x-ray for June 3. The record does not explain why Harris did not note the receipt of the medical records until May 31 or why she scheduled the x-ray for June 3.

---

the record contains nothing that would permit an inference that either individual defendant was responsible for dispensing Miller's medication.

[4] Heritage Valley had previously provided BCJ with some of Miller's records from his May 23 visit, but that set of records may not have been complete.

4

On June 3, an x-ray of Miller's left wrist revealed a fracture. Although Harris did not report the x-ray results to Dr. Bonatatibus until June 6, the record is unclear as to when Harris first saw the x-ray report. Harris admits she did not call to check on the x-ray results and that it was possible she was away from her usual post from June 3 to June 6 for electronic medical record training. In the meantime, Wegner had examined Miller on June 4. The physical assessment form noted that Miller's left wrist was swollen and that there was a fracture.

After Harris informed Dr. Bonatatibus of the x-ray results on June 6, Dr. Bonatatibus ordered that Miller be examined by an orthopedic specialist. That same day, Harris scheduled an appointment with an orthopedic specialist, Dr. Bernard Hirsch, for June 10. Dr. Hirsch examined Miller on June 10. Dr. Hirsch recommended that Miller be referred to a hand surgeon.

Also on June 10, the Court of Common Pleas of Beaver County issued an order releasing Miller on a $1.00 bond and instructing that Miller be detained and transported to a state facility. BCJ was informed that the transfer would occur on June 13.

BCJ's records reflect that Miller received his medications, as prescribed, from June 1 to June 13. The record also reflects that Miller was provided with a sling or splint for his left wrist at some point during his incarceration.

Harris filled out Miller's Inmate Transfer Information form, noting in relevant part, that Miller: (1) had a splint on his left hand/wrist for a diagnosed fracture; (2) was on Naproxen and Tylenol; (3) had been seen by an orthopedist on June 10; and

(4) required a consultation with a hand surgeon. Miller was transferred to state custody on June 13.

Miller was not examined by a hand surgeon until July 3, nearly three weeks after Miller's transfer from BCJ. The surgeon assessed Miller's injury as a "[m]alunion left distal radius" and explained that, because it had been six weeks since the fracture, the "bone [was] nearly completely healed and … in [an] unacceptable alignment." (Doc. No. 55-14.) The surgeon operated on Miller's left wrist on August 1.

## II.    Procedural History

Miller sued Beaver County, Deputy Warden Carol Steele-Smith, BCJ's medical services provider Southern Health Partners, and various John and Jane Doe medical staff and prison officials, pursuant to 42 U.S.C. § 1983, alleging that he had been subjected to cruel and unusual punishment and denied due process of law. The parties consented to the jurisdiction of a United States Magistrate Judge. Miller later amended his complaint to add Beth Harris, Betty Wegner, and Angela Pugh as defendants. Pugh was subsequently dismissed from the case by stipulation. All defendants moved for summary judgment, which the Court granted. Miller does not appeal the grant of summary judgment in favor of Beaver County and Warden Steele-Smith. Miller only appeals the order granting summary judgment for Southern Health Partners, Harris, and Wegner.

## III. Discussion[5]

Miller argues that the Magistrate Judge erred in granting summary judgment against him because the record contains sufficient evidence for a jury to determine that Harris and Wegner were deliberately indifferent to his wrist fracture and that Southern Health Partners is liable for its failure to train or supervise Harris and Wegner. Miller further contends that the alleged deliberate indifference resulted in the malunion of his wrist.

The Eighth Amendment requires that jails provide their inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). A jail official's deliberate indifference to an inmate's serious medical needs thus runs afoul of the Eighth Amendment's prohibition on cruel and unusual punishment. *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (citing *Estelle*, 429 U.S. at 104-05). To succeed on an Eighth Amendment medical care claim, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'" *Id.* (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). The parties agree that Miller's wrist fracture was a serious medical need. Accordingly, our inquiry focuses on whether it was error to

---

[5] The Magistrate Judge exercised jurisdiction under 28 U.S.C. §§ 636(c)(1) and 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a grant of summary judgment is *de novo*. *Tomasso v. Boeing Co.*, 445 F.3d 702, 705 n.3 (3d Cir. 2006). Summary judgment is appropriate if there are no genuine disputes of material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 250. Again, in reviewing a summary judgment ruling, we view the facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248-49.

7

determine that, as a matter of law, the record cannot support a finding that Harris or Wegner acted with deliberate indifference to Miller's wrist fracture.

To make out a subjective showing of deliberate indifference, Miller had to demonstrate that Harris and Wegner were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that Harris and Wegner also drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, Miller must show that Harris and Wegner "acted or failed to act despite [their] knowledge of a substantial risk of serious harm." *Id.* at 842. Miller can make a subjective showing of deliberate indifference by adducing circumstantial evidence that "the excessive risk was so obvious that [Harris and Wegner] must have known of the risk." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 842).

We have found prison officials to be deliberately indifferent in a number of circumstances, "including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197.

As we have previously explained, however, a plaintiff cannot show deliberate indifference simply by demonstrating negligence in addressing a medical condition or a disagreement over the course of treatment received. *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) (explaining that deliberate indifference requires something "more than negligence"); *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) ("[M]ere allegations of [medical] malpractice do not raise issues of

8

constitutional import."); *id.* ("[M]ere disagreement as to the proper medical treatment [does not] support a claim of an [E]ighth [A]mendment violation.").

## A. Delay in Scheduling X-Ray

Miller argues that the delay in scheduling his x-ray constituted deliberate indifference and that the Magistrate Judge erred in holding, as a matter of law, that the delays attributed to Harris did not constitute deliberate indifference. The Judge provided two reasons for why the delay in scheduling Miller's x-ray was not deliberate indifference: (1) case law dictates a delay in scheduling an x-ray does not constitute deliberate indifference, and (2) at most, Harris was negligent.

We agree that the record supports, at most, a conclusion of negligence.[6] Miller contends that Harris delayed scheduling his x-ray by not immediately implementing Dr. Bonatatibus's May 28 order to schedule an x-ray, and by further delaying the implementation of Dr. Bonatatibus's May 31 order to schedule an x-ray, which was not then set to occur until June 3.

---

[6] We agree with Miller that the facts here are distinguishable from the case relied upon by the Magistrate Judge to determine that Harris's delay in scheduling his x-ray did not constitute deliberate indifference. In that case, *Cobbs v. Caputo*, 578 F. App'x 84 (3d Cir. 2014), we repeated the well-established principle that a "*medical decision* not to order an X-ray … does not represent cruel and unusual punishment." *Id.* at 85 (quoting *Estelle*, 429 U.S. at 107) (emphasis added). Here, Harris's delay in ordering the x-ray was not the result of a medical decision. Dr. Bonatatibus decided to order the x-ray. The claimed "delay" is instead that Harris did not implement Dr. Bonatatibus's order immediately. The implicit conclusion that deliberate indifference cannot be shown by a delay motivated by a non-medical reason in implementing a doctor's order is contrary to our precedent. *See Rouse*, 182 F.3d at 197 ("We have found 'deliberate indifference' in a variety of circumstances, including where the prison official … delays necessary medical treatment based on a non-medical reason … .").

9

As an initial matter, the record contains no evidence that Harris actually received Heritage Valley's fax containing the medical records on May 28. The record demonstrates only that Harris was aware of Dr. Bonatatibus's May 28 order and noted the receipt of the medical records on May 31.[7] Harris reported that same day to Dr. Bonatatibus that no x-ray had been performed. The record also demonstrates that Harris did not delay in executing Dr. Bonatatibus's May 31 order to schedule an x-ray. Rather, on May 31, she scheduled the x-ray for June 3. There is simply no evidence, circumstantial or otherwise, that Harris was aware that scheduling an x-ray for June 3 would cause Miller harm. Even if Harris forgot to inform Dr. Bonatatibus for three days that no x-ray had been performed earlier, at most that demonstrates negligence, which is not sufficient to make out a claim of deliberate indifference. *See Durmer*, 991 F.2d at 67 (explaining that "a prisoner must show more than negligence" to establish deliberate indifference).

Furthermore, a deliberate indifference claim premised on delayed medical treatment requires a plaintiff to demonstrate that "the delay … was motivated by non-medical factors." *Pearson*, 850 F.3d at 537. The lack of an identifiable medical reason explaining a treatment delay does not necessarily mean that the delay was motivated by a non-medical reason. The record does not support finding that any delay attributable to Harris was motivated by non-medical factors, such as a desire to punish Miller, to lessen

_____

[7] While an unidentified BCJ employee noted receipt of Heritage Valley's fax on May 28, Miller did not link the notation to Harris.

10

her own workload, or to save BCJ money. *See, e.g.*, *Durmer*, 991 F.2d at 68-69 (reversing summary judgment for defendant doctor, in part because the record contained evidence that the denial of medical treatment was motivated by a desire to avoid the "burden and expense" the prison would have incurred).[8]

### B. Delay in Reporting X-Ray Results

Miller next argues that Harris and Wegner were deliberately indifferent for failing to relay the June 3 x-ray results to Dr. Bonatatibus before June 6. Again, there is no evidence to establish when Harris or Wegner received the x-ray results. Harris testified that she was away from her usual post between June 3 and June 6 for electronic medical record training, but she admitted she never called to check about the x-ray results. The record supports, at most, a finding that she was either negligent in failing to review the x-ray results prior to June 6 or negligent in failing to report the results to Dr. Bonatatibus until June 6.

Wegner examined Miller on June 4 and noted that Miller had a fracture. Interpreting the record in the light most favorable to Miller, we may infer that Wegner was aware of the x-ray results on June 4 when she made that notation. Miller argues that

---

[8] Miller contends that Wegner was also deliberately indifferent by failing to order an x-ray on May 28 because the record shows she acknowledged Dr. Bonatatibus's May 28 order in writing. That order, however, directed the medical staff to first obtain Miller's medical records to determine whether an x-ray had already been performed. There is no evidence Wegner received the records Heritage Valley faxed on May 28 or that the failure to check that the medical records had come in was anything more than negligence. And, as is true of Harris, the record contains no evidence suggesting that any delay was motivated by non-medical factors.

because Wegner was a registered nurse, it would have been immediately apparent to her that further delaying treatment would expose him to excessive risk of harm. The record, however, does not support that Wegner denied Miller medical treatment for his wrist fracture or that, between June 4 and June 6, she delayed any treatment already prescribed for Miller. Even assuming that failing to immediately report the x-ray results to Dr. Bonatatibus or to otherwise inform him of her belief that Miller had a fracture rises to the level of medical malpractice, that showing is still not sufficient to make out a claim of deliberate indifference.[9] *See Lanzaro*, 834 F.2d at 346 ("[M]ere allegations of malpractice do not raise issues of constitutional import.").

## C. Circumstantial Evidence of Deliberate Indifference

Miller next contends that the totality of delays caused by Harris constitute circumstantial evidence that she was subjectively aware of the risk to Miller of delaying his treatment. In addition to the delays in ordering an x-ray and reporting the results, Miller faults Harris for scheduling the appointment with Dr. Hirsch for June 10 and for failing to schedule a consultation with a hand surgeon.

The record does not support Miller's inferential leap. There is no evidence, direct or circumstantial, that Harris had a subjective awareness that the speed at which Miller's medical care progressed put him at risk for suffering a malunion of his wrist. That alone is sufficient to defeat Miller's claim against Harris. *See Farmer*, 511 U.S at 837

---

[9] To be clear, we are not tasked with deciding whether Harris or Wegner was actually negligent, or actually committed medical malpractice, because that issue is not before us. Accordingly, we do not opine on that issue.

12

(explaining that a prisoner asserting an Eighth Amendment claim must show that "the [prison] official … [was] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that the prison official also drew] the inference"). Nor is Miller's dissatisfaction with the speed at which his treatment progressed sufficient to establish deliberate indifference. *See, e.g.*, *Lanzaro*, 834 F.2d at 346 (explaining that "mere disagreement" over the proper course of medical treatment does not establish an Eighth Amendment violation).[10]

### D. Southern Health Partners' Liability

Last, Miller argues that the Magistrate Judge erred in granting summary judgment in favor of Southern Health Partners. We agree with the Magistrate Judge that that defendant cannot be liable under a theory of municipal liability because Miller has failed to demonstrate that he suffered a violation of his constitutional rights.[11] *See City of Los*

---

[10] Miller also argues that Harris, who was not licensed to practice nursing, engaged in the unauthorized practice of nursing by implementing three of Dr. Bonatatibus's orders, namely, when she scheduled an x-ray, scheduled a doctor's appointment, and provided Miller with "bottom bunk status." (App. 95-96.) While we need not resolve the issue, we note our doubt that performing ministerial tasks such as scheduling appointments or assigning sleeping placements constitutes the unauthorized practice of nursing in Pennsylvania. *See* 63 Pa. Stat. and Cons. Stat. § 653(10) (permitting non-licensed individuals to perform "[a]uxiliary services … including … minor and very basic nursing services for patients"). Even if such acts did constitute the unauthorized practice of nursing, that does not transform ordinary negligence into a matter of constitutional concern.

[11] BCJ contracted with Southern Health Partners to serve as the jail's medical services provider. Because Southern Health Partners was acting under color of state law in that capacity, it was subjected to the municipal liability claim at issue here. *See Natale*, 318 F.3d at 583-84 (analyzing claim against prison's private medical services provider under a municipal liability framework).

13

*Angeles v. Heller*, 475 U.S. 796, 799 (1986) (explaining that a municipality cannot be held liable pursuant to § 1983 if the plaintiff suffered no constitutional injury).

## IV. Conclusion

The record demonstrates Miller received medical care throughout his three-week incarceration at BCJ. BCJ staff prescribed and provided Miller with pain medication, provided him with a sling, assessed his need for an x-ray, arranged for Miller to see an orthopedic specialist, and ensured that the state authorities to whom he was transferred were aware of his condition and the need to see a hand surgeon.[12] To the extent the record demonstrates any culpability on the part of Harris or Wegner, it does not rise above negligence or simple medical malpractice. Miller's disagreement with his course of treatment, or the speed at which his treatment progressed, is insufficient to establish deliberate indifference to his wrist fracture.

We will therefore affirm the grant of summary judgment.

---

[12] We note that state authorities, not the Defendants, were responsible for scheduling Miller's appointment with a hand surgeon three weeks after he was transferred to state custody. Miller has raised no issue with that delay. (*See* App. 63 (Miller Expert Report) ("Upon entering the State Correctional System, Mr. Miller received the treatment his serious medical condition required … .").)

14